# Disposition of Proceeds from the Sale of Government Buildings Acquired with Social Security Trust Funds

The General Services Administration is authorized, under section 412 of the Consolidated Appropriations Act of 2005, to convey Social Security Administration buildings that were acquired with money derived from the Social Security Trust Funds and to retain the net proceeds in the Federal Buildings Fund.

December 17, 2010

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

You have asked us to resolve a disagreement about the retention of proceeds from the sale of certain government office buildings.[1] At issue is whether the Social Security Administration ("SSA") or the General Services Administration ("GSA") is entitled to the proceeds from the sale of buildings currently occupied by SSA and originally acquired with money from the Federal Old-Age and Survivors Insurance Trust Fund and the Disability Insurance Trust Fund ("Social Security Trust Funds" or "Trust Funds").[2] Relying on the Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 (codified as amended at 40 U.S.C. § 101 *et seq.* (2006 & Supp. III 2009)) ("Property Act"), SSA argues that any proceeds from the sale of the buildings should be credited to the Social Security Trust Funds. GSA contends that it is entitled to the funds, citing both section 574 of the Property Act and a separate authority to convey property and to keep any resulting income—section 412 of division H of the Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, div. H, § 412, 118 Stat. 2809, 3199, 3259 (2004) ("section

---

[1] *See* Memorandum for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Black, General Counsel, Social Security Administration (Oct. 1, 2008) ("SSA Memo").

[2] More precisely, your question pertains to "the sale of real property purchased, constructed, or otherwise acquired with money" from the Social Security Trust Funds. SSA Memo at 1. In this opinion, we use the term "acquired" as a shorthand for the various means by which Trust Fund money may have been used to obtain real property. Furthermore, we have used interchangeably the terms "building" and "real property"; nothing in our opinion turns on the distinction.

412").[3] We conclude that section 412 authorizes GSA to convey the SSA-occupied buildings acquired with Trust Fund monies and to retain the net proceeds from those transactions.[4] We thus have no occasion to address the application of section 574 of the Property Act to the contemplated sale of the SSA buildings here.

## I.

Ordinarily, when federal property is sold under the Property Act,[5] the proceeds of the sale, excluding certain expenses incurred by GSA in disposing of the property, are deposited in the Land and Water Conservation Fund in the Treasury. *See generally* 40 U.S.C. § 572(a); *see also* 16 U.S.C. § 460*l*-5 (2006).[6] Section 574 of the Property Act establishes an

---

[3] GSA's initial submission to our Office contained only a brief description of section 412. Memorandum for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Leslie A. Nicholson, General Counsel, General Services Administration (Jan. 13, 2009) ("GSA Memo"). We then solicited the supplemental views of both agencies about the applicability of section 412 to the conveyance of real property acquired with Trust Fund monies. *See* Memorandum for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Kris E. Durmer, General Counsel, General Services Administration (Jan. 15, 2010) ("GSA Supp. Memo"); Memorandum for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from David F. Black, General Counsel, Social Security Administration (Jan. 19, 2010) ("SSA Supp. Memo").

[4] GSA's own regulations pertaining to the conveyance of federal real property provide that "[e]xcept for disposals specifically authorized by *special legislation*, disposals of real property must be made only under the authority of Chapter 5 of Subtitle I of Title 40 of the United States Code [i.e., the Property Act]." 41 C.F.R. § 102-75.290 (2010) (emphasis added). GSA's Associate General Counsel has informed us of GSA's determination that section 412 falls under the exception for "special legislation," so that this regulation would not restrict its authority under section 412 to dispose of property and retain the net proceeds. (GSA has made similar determinations with respect to other statutory disposal authorities, e.g., 42 U.S.C. § 2201(g) (2006) (authorizing Atomic Energy Commission to dispose of its real and personal property).) We have not been asked to address section 102-75.290, and we intimate no view on GSA's interpretation of the regulation as it pertains to section 412.

[5] Not all federal property is subject to the Property Act. *See* 40 U.S.C. § 113(e) (listing numerous exceptions to the application of the Act).

[6] In pertinent part, section 460*l*-5 of title 16 provides:

During the period ending September 30, 2015, there shall be covered into the land and water conservation fund in the Treasury of the United States, . . . the following

exception to this general rule. If "property [has been] acquired with amounts . . . not appropriated from the general fund of the Treasury,"

> [t]he net proceeds of a disposition or transfer of [such] property . . . shall be . . . [1] [either] credited to the applicable reimbursable fund or appropriation; or . . . [2] paid to the federal agency that determined the property to be excess.

40 U.S.C. § 574(a).[7] SSA contends that section 574 applies to sales of SSA-occupied office buildings that were originally acquired with money from the Social Security Trust Funds and that the provision enables it to keep the proceeds from such sales.

GSA disagrees with SSA's interpretation of section 574, but, more important for resolving the question before us, GSA contends that its claim to any proceeds from the sale of SSA-occupied buildings rests on an independent statutory authority: section 412. *See* GSA Memo at 10-11; *see also* GSA Supp. Memo at 1-2.[8] Because we agree with GSA that

---

> revenues and collections: . . . All proceeds [with certain exceptions] hereafter received from any disposal of surplus real property and related personal property under the Federal Property and Administrative Services Act of 1949, as amended, notwithstanding any provision of law that such proceeds shall be credited to miscellaneous receipts of the Treasury.

16 U.S.C. §§ 460*l*-5 & 460*l*-5(a). Thus, although the Property Act provides that the "excess amounts [from the sale of federal real property] beyond [the] current operating needs [of GSA] shall be transferred . . . to miscellaneous receipts," 40 U.S.C. § 572(a)(3), section 460*l*-5 of title 16 instead directs those amounts to the Land and Conservation Fund.

[7] "Excess" property is a term of art in the Property Act and means property that an agency determines it no longer requires in order to meet that "agency's needs or responsibilities." 40 U.S.C. § 102(3); *see also id.* § 524(a)(2) (requiring each executive agency subject to the Act to "continuously survey property under its control to identify excess property").

[8] Noting that "SSA has provided no evidence that monies of the Trust Funds were used to directly acquire the[] properties" at issue, GSA argues that it, and not SSA, is the "landholding agency that would declare any of the SSA-occupied [b]uildings excess to the Government's needs." GSA Memo at 3. Furthermore, GSA contends that it, and not SSA, "acquired" some of the properties at issue using money from GSA's Federal Buildings Fund—a fund that is created by the Property Act and contains revenue collected by GSA, including rent from federal agencies, *see* 40 U.S.C. § 592 (establishing the Federal Buildings Fund). GSA Memo at 6. In light of our conclusion—that section 412 vests GSA with discretion to convey SSA property and to retain the net proceeds, notwithstanding

265

section 412 would permit GSA to retain the net proceeds of sales of SSA-occupied buildings, we have no occasion to address the applicability of section 574.

## II.

### A.

Section 412 authorizes GSA to convey property and retain any resulting net proceeds in the Federal Buildings Fund. Section 412 provides:

> Notwithstanding any other provision of law, the Administrator of General Services may convey, by sale, lease, exchange or otherwise, including through leaseback arrangements, real and related personal property, or interests therein, and retain the net proceeds of such dispositions in an account within the Federal Buildings Fund to be used for the General Services Administration's real property capital needs: *Provided*, That all net proceeds realized under this section shall only be expended as authorized in annual appropriations Acts: *Provided further*, That for the purposes of this section, the term "net proceeds" means the rental and other sums received less the costs of the disposition, and the term "real property capital need" means any expenses necessary and incident to the agency's real property capital acquisitions, improvements, and dispositions.

118 Stat. at 3259. Invoking section 412, GSA has retained approximately $140 million in proceeds from the sale of real property since Congress enacted the provision in 2004. See E-mail for Pankaj Venugopal, Attorney-Adviser, Office of Legal Counsel, from Richard R. Butter-

---

section 574—we need not resolve the agencies' dispute about the application of section 574.

SSA's request for our opinion is not limited to any specific building SSA intends to vacate, and we thus have no need to consider whether a particular SSA building was in fact acquired with money from the Trust Funds. We understand that, at the least, SSA occupies some buildings acquired with those funds. *Cf.* Memorandum for Stanley Ebner, General Counsel, Office of Management and Budget, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel at 8 (Dec. 20, 1973) (noting that SSA's facility in Woodlawn, Maryland "was funded by appropriations from the Federal Old Age and Survivors Insurance Trust Fund").

worth, Jr., Senior Assistant General Counsel, General Services Administration (Dec. 6, 2010).

Section 412 supports GSA's claim to proceeds from a sale of SSA buildings, including those acquired with money from the Social Security Trust Funds. The provision authorizes the GSA Administrator to "convey" "by sale" "real and related personal property," and GSA may retain the "net proceeds of such dispositions" for its Federal Buildings Fund. On its face, section 412 makes no exception for the type of Social Security buildings at issue here.

Section 574 of the Property Act, however, might be read to entitle SSA to the proceeds of the sale of SSA buildings. Assuming that section 412 and section 574 lead to divergent outcomes, we have a "duty . . . to regard each as effective" if the two statutes are "capable of co-existence." *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *see also* SSA Supp. Memo at 2 (urging the application of the presumption against implied repeal). Under a "'long-standing maxim of statutory construction . . . statutes are enacted in accord with the legislative policy embodied in prior statutes, and . . . therefore statutes dealing with the same subject should be construed together.'" *Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information*, __ Op. O.L.C. Supp. __, at *5 (May 18, 1999) ("IIRIRA Opinion") (quoting Memorandum for Glen E. Pommerening, Assistant Attorney General for Administration, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Establishing a Maximum Entry Age Limit for Law Enforcement Officer Positions in the Department of Justice* at 3 (Apr. 3, 1975), https://www.justice.gov/olc/page/file/936041/download). We believe that the apparent conflict between the two statutes is properly resolved by reading section 412 to give GSA the discretion to convey SSA buildings, *see* 118 Stat. at 3259 ("the Administrator of General Services *may* convey" (emphasis added)), and retain the proceeds of the sales, with section 574 potentially applying if GSA chooses not to exercise this discretion.

Even if we assume that section 574 of the Property Act would otherwise entitle SSA to the net proceeds of a building sale, section 412 would apply "[n]otwithstanding any other provision of law," a category that necessarily includes section 574. As a general rule, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the

provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993); *see also, e.g.*, *Applicability of Tax Levies to Thrift Savings Plan Accounts*, 34 Op. O.L.C. 157, 161–62 (2010) ("Tax Levies Opinion"); IIRIRA Opinion at *7 (observing that a prefatory "notwithstanding" clause "does reflect a congressional intention to displace inconsistent law"). Some courts have observed that "'a clearer statement'" of congressional intent "'to supersede all other laws . . . is difficult to imagine,'" *Cisneros*, 508 U.S. at 18 (quoting *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (internal quotation marks omitted) (collecting cases)); *see also Miccosukee Tribe of Indians of Fla. v. Army Corps of Eng'rs*, 619 F.3d 1289, 1298 (11th Cir. 2010) (noting that a "'notwithstanding' clause'" was "'Congress's indication that the statute containing that language is intended to take precedence over any preexisting or subsequently-enacted legislation [on the same subject]'" (alteration in original)); *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) ("[T]he '[n]otwithstanding any other provision of law' clause demonstrates that Congress intended to supersede any previously enacted conflicting provisions") (alterations in original, internal quotation marks omitted). In our view, section 412's "notwithstanding" clause indicates Congress's intent to override potentially applicable and inconsistent statutes, including section 574 of the Property Act.[9]

We do not read section 412's "notwithstanding" clause as making an implicit exception for section 574. Indeed, other sections of the same law in which section 412 appears authorize the sale of certain federal real property under a more narrowly tailored "notwithstanding" clause. *See* Consolidated Appropriations Act §§ 407, 638, 118 Stat. at 2922, 3258 ("[n]otwithstanding 40 U.S.C. 524, 571, and 572"). Congress thus knew how to restrict the scope of a "notwithstanding" clause to certain provi-

---

[9] A "notwithstanding" clause is "'best read simply to qualify the substantive requirement that follows.'" Tax Levies Opinion, 34 Op. O.L.C. at 162 n.4 (quoting *Prioritizing Programs to Exempt Small Businesses from Competition in Federal Contracts*, 33 Op. O.L.C. 284, 296 (2009)). Thus, such a clause does not itself "'support a broad construction of the substantive provision that would give rise . . . to inconsistencies' with other statutes." *Id*. (quoting IIRIRA Opinion at *7). Here, we conclude only that the substantive clauses of section 412 authorize GSA to retain the net proceeds of the sales of real property, while section 574 of the Property Act, when applicable, might direct such proceeds to SSA.

sions of the Property Act, but chose instead to make section 412 broadly applicable "notwithstanding any other provision of law." Furthermore, on several occasions when Congress has intended section 574 to apply, it has made that intention plain. When the same Congress that enacted section 412 authorized the Secretary of Defense to convey a certain parcel of land, it expressly stated that "[s]ection 574(a) of title 40, United States Code, shall apply to the consideration received." Pub. L. No. 108-136, § 2861(c), 117 Stat. 1392, 1736 (2003). Similarly, when Congress directed proceeds from the sale of surplus real property and related personal property to the Land and Water Conservation Fund ("LWCF"), it excluded proceeds governed by section 574. 16 U.S.C. § 460*l*-5(a) (providing that the LWCF receives "[a]ll proceeds (except so much thereof as may be otherwise obligated, credited, or paid under authority of those provisions of law set forth in section . . . 574(a)–(c) of title 40") hereafter received from any disposal of surplus real property and related personal property under the [Property Act], as amended, notwithstanding any provision of law that such proceeds shall be credited to miscellaneous receipts of the Treasury"). In light of these other provisions, the absence in section 412 of any reference to section 574 bolsters the conclusion that section 412 overrides "any other federal law," including section 574.

We accordingly believe that section 412 vests the Administrator of GSA with discretion to sell SSA-occupied buildings that have been acquired with money from the Social Security Trust Funds and to retain the net proceeds of those sales in the Federal Buildings Fund.

### B.

Contending that section 412 would not displace the application of section 574 of the Property Act to the buildings at issue, SSA relies upon the canon of statutory interpretation that a general statute will not be construed to repeal a specific statute by implication, unless Congress expresses a clear intention to effect the repeal. SSA Supp. Memo at 2–3; *see generally Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (noting the "strong presumption against repeals by implication, especially an implied repeal of a specific statute by a general one" (internal citation omitted)). SSA contends that section 412 "does not amend, expressly or implicitly, the more specific legislation that addresses a particular subset of real property proceeds [i.e., section 574]." SSA Supp.

Memo at 2–3. It further argues that the rule against implied repeal has special force with respect to provisions, such as section 412, that were enacted in appropriations laws. Alternatively, SSA contends that section 412 was a temporary measure that expired at the end of the 2005 fiscal year. *Id.* at 3.

We first consider the argument that "repeals by implication are especially disfavored in the appropriations context." *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 440 (1992). Although section 412 was enacted as part of an appropriations statute, we do not believe that this admonition applies here, because section 412 is substantive legislation. A special rule for implied repeals by appropriations statutes is necessary because without it, "every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 190 (1978) ("*TVA*"). For this reason, the canon against implied repeal by appropriations bills is codified in the rules of both houses of Congress, including House Rule XXI(2)(b), H.R. Doc. No. 107-284, at 814 (2003) ("A provision changing existing law may not be reported in a general appropriation bill"); *see also* Senate Rule 16.4, S. Doc. No. 107-1, at 15 (2002). Citing House Rule XXI, the *TVA* Court observed that the absence of a presumption against implied repeal by appropriations statutes would "lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, [and] it would flout the very rules the Congress carefully adopted to avoid this need." *TVA*, 437 U.S. at 190; *see also United States v. Will*, 449 U.S. 200, 222 (1980) ("[T]he rules of both Houses limit the ability to change substantive law through appropriations measures."); *Andrus v. Sierra Club*, 442 U.S. 347, 359–60 (1979) (noting that the "rules of both Houses prohibit [substantive] legislation from being added to an appropriation bill" (internal quotation marks omitted)).

Here, the House rule cited by the *TVA* Court was invoked against the language in section 412 when it was being considered by the House acting as the Committee of the Whole. The provision that was enacted ultimately as section 412 first appeared in one of the several appropriations bills later incorporated into the 2005 Consolidated Appropriations Act—specifically, the identically worded section 409 of the Transporta-

tion, Treasury, and Independent Agencies Appropriations Act, H.R. 5025, 108th Cong. (as reported by H. Comm. on Appropriations, Sept. 8, 2004). During the debate over H.R. 5025, a member raised a point of order that section 409 violated House Rule XXI. 150 Cong. Rec. 18,426 (2004) (statement of Rep. Shays). The Chair sustained the objection and, as a result, section 409 was struck from H.R. 5025 before its passage by the House. *Id.* ("The Chair finds that this section [409] explicitly supersedes existing law. The section therefore constitutes legislation in violation of clause 2 of rule XXI."). When H.R. 5025, along with several other appropriations bills, was referred to the conference committee, however, section 409's authority for GSA to convey property and retain its proceeds was reinserted as section 412 of the Consolidated Appropriations Bill. *See* H.R. Rep. No. 108-792, at 665 (2004) (Conf. Rep.) (noting that the "conference agreement" included the "Transportation, Treasury, and Independent Agencies Appropriations Act, 2005 [H.R. 5025]").[10] In light of the determination under the House Rules that the language of section 412, as contained in section 409 of H.R. 5025, "supersede[d] existing law," 150 Cong. Rec. at 18,426, we believe that the special rule against "implied repeals" by appropriations measures does not apply to section 412.

More broadly, SSA contends that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." SSA Supp. Memo at 2–3 (quoting *Morton*, 417 U.S. at 550–51). We believe that section 412 reveals a sufficiently "clear intention" to supersede conflicting law, including provisions concerning specific types of federal property, such as section 574.[11] Congress made section 412 appli-

---

[10] Although section 412 is identical to section 409 of H.R. 5025, no objection appears to have been raised in the House against the inclusion of section 412 in the Consolidated Appropriations Act. But because the House chose to waive all points of order in the consideration of the omnibus appropriations bill, *see* H.R. Res. 866, 108th Cong. (2004), 150 Cong. Rec. at 25,051, we do not believe that this silence undercuts the House's earlier determination that the same language—contained in section 409 of H.R. 5025—"explicitly supersede[d] existing law."

[11] The conference report accompanying the passage of section 412 notes only that section 412 "allow[s] GSA to convey property and retain the proceeds in the Federal Buildings Fund." H.R. Rep. No. 108-792, at 1455 (2004). An earlier House Report sets out an identical description of the provision that became section 412. H.R. Rep. No. 108-671, at 147 (2004).

cable "notwithstanding any other provision of law," and although it expressly referred to section 574 in similar statutes about disposition of property or retention of proceeds, it omitted any such reference in section 412. *See United States v. DeCay*, 620 F.3d 534, 540 (5th Cir. 2010) (rejecting application of canon of specific trumps the general, noting that "'notwithstanding any other Federal law' clause signals a clear Congressional intent to override conflicting federal law"); *see also Novak*, 476 F.3d at 1055-56 (holding similar "notwithstanding" phrase constitutes, *inter alia*, "clear intention" for general statute to supersede arguably more specific statute). The intention to override provisions such as section 574 appears plain enough.

This conclusion is buttressed by the text of the Property Act, as amended in 2002, when Congress revised and recodified the provisions of the 1949 Act. *See* Pub. L. No. 107-217, 116 Stat. 1062. In section 5(b)(3) of the 2002 Act, Congress provided that "[t]his Act restates certain laws enacted before April 1, 2002. Any law enacted after March 31, 2002, that is inconsistent with this Act . . . supersedes this Act to the extent of the inconsistency." 116 Stat. at 1303 (codified as note preceding 40 U.S.C. § 101). This provision shows congressional intent to "suspend[ ]the Property Act's applicability" in the face of a subsequent, inconsistent statute. *Shawnee Tribe v. United States*, 423 F.3d 1204, 1215–16 (10th Cir. 2005) (noting that although section 5(b)(3) is "not an operative part of the statute itself," "th[e] statement was legislatively enacted as part of the public law and is a good indication of Congressional intent").[12] Thus, even if the

---

[12] In *Shawnee Tribe*, the Tenth Circuit held that a 2005 provision under which the Secretary of the Army could convey a former military installation on an Indian reservation overrode section 523 of the Property Act, which would have directed GSA to transfer that property to a tribe. 423 F.3d at 1215–16; *see also* 40 U.S.C. § 523(a) ("The Administrator of General Services shall prescribe procedures necessary to transfer to the Secretary of the Interior, without compensation, excess real property located within the reservation of any group, band, or tribe of Indians that is recognized as eligible for services by the Bureau of Indian Affairs.").

Moreover, the Tenth Circuit held that section 113 of the Property Act did not compel a different conclusion. Section 113 provides that (save for certain exceptions applicable neither here nor in the *Shawnee Tribe* case), the "authority conferred by this subtitle [including, as pertinent here, sections 523 and 574] is in addition to any other authority conferred by law and *is not subject to any inconsistent provision of law*." 40 U.S.C. § 113(a) (emphasis added). But in light of section 5(b)(3) of the 2002 Act, the court held that section 113 "stand[s] for the relatively unremarkable proposition that the Property

application of section 412 to Trust Fund buildings would be inconsistent with section 574 of the Property Act, section 412 would "supersede[]" section 574 "to the extent of the inconsistency," in accordance with section 5(b)(3) of the 2002 Act.

SSA alternatively contends that "even if Section 412 repealed or superseded 40 U.S.C. § 574, that effect expired at the close of Fiscal Year (FY) 2005 when the annual appropriations act expired." SSA Supp. Memo at 3. GSA argues that section 412 operates as "permanent" legislation that remained in effect beyond the end of the 2005 fiscal year ("FY 2005"). Indeed, GSA has collected approximately $136 million in net proceeds under its section 412 authority since the end of FY 2005.

To determine whether a provision in an appropriations measure operates as permanent law, we follow these "basic governing principles":

> While appropriation acts are "Acts of Congress" which can substantively change existing law, there is a very strong presumption that they do not, and that when they do, the change is only intended for one fiscal year. In fact, a federal appropriations act applies only for the fiscal year in which it is passed, unless it expressly provides otherwise. Accordingly, a provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent.

*Severability and Duration of Appropriations Rider Concerning Frozen Poultry Regulations*, 20 Op. O.L.C. 232, 240 (1996) (quoting *Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 273–74 (D.C. Cir. 1992)). The "whole question" of permanence "depends on the intention of Congress as expressed in the statutes." *Id*. at 239 (internal quotation marks omitted). On balance, we believe that the text of section 412 shows that the provision remains in effect.

The text of section 412 accords with the conclusion that it is permanent legislation. As we have explained, Congress's intent to enact permanent legislation is "principally established though 'words of futurity or permanence,' such as the phrase 'to apply in all years hereafter.'" *Id*. at 240; *see*

---

Act trumps any pre-existing laws not specifically excluded by [section] 113 when it was re-enacted in 2002, but that the Congress . . . is free to change the Property Act's coverage in the future by any act enacted after March 31, 2002." *Shawnee Tribe*, 423 F.3d at 1216.

*also*, *e.g.*, *Whatley v. Dist. of Columbia*, 447 F.3d 814, 819 (D.C. Cir. 2006) (noting that phrase "[n]one of the funds appropriated under this Act, *or in appropriations Acts for subsequent fiscal years*" "clearly indicate[d] that it is intended to be permanent"). Section 412 provides that "all net proceeds realized under this section shall only be expended as authorized in annual appropriations Acts."[13] The reference to spending net proceeds pursuant to future spending legislation shows that, at a minimum, the authority to retain the net proceeds from property sales made under section 412 is permanent. If GSA's authority to retain the net proceeds of its dispositions under section 412 in the Federal Buildings Fund had been effective only for FY 2005, any such proceeds would presumably have been transferred from GSA's Federal Buildings Fund to the Treasury at the end of that fiscal year. Yet if GSA no longer retained any such net proceeds, it would have made little sense for Congress to have permitted GSA's "expend[itures]" of that money only "as authorized in annual appropriations Acts." Thus, the reference to future "annual appropriations Acts" presumes that GSA is able to retain the net proceeds collected under section 412 beyond FY 2005.[14]

It might be argued that while the authority to retain proceeds in the Federal Buildings Fund is permanent for proceeds of conveyances made in FY 2005, the authority to make those conveyances is limited to FY

---

[13] "[T]he words 'notwithstanding any other provision of law' are not words of futurity and, standing alone, offer no indication as to the duration of the provision." 1 Government Accountability Office, *Principles of Federal Appropriations Law* 2-36 (3d ed. 2004).

[14] The term "annual appropriations Acts" appears in a proviso, Consolidated Appropriations Act, div. D, § 412, 118 Stat. at 3259 ("*Provided*, That all net proceeds realized under this section shall only be expended as authorized in annual appropriations Acts"), and we recognize that words of futurity that "appear[] only in an exception clause" may apply only to that clause and not to the entire statute. *See Principles of Federal Appropriations Law* at 2-35. If the words of futurity were read as limited only to the proviso, the restriction on GSA's spending of net proceeds from conveyances in FY 2005 would be permanent, while the authorities contained in section 412's operative clause—both the authority to convey property and the authority to retain the net proceeds in the Federal Building Fund—would have expired at the end of FY 2005. We do not believe that section 412's words of futurity should be understood in this manner. Because the reference to future spending legislation presupposes the permanence of GSA's authority to retain the proceeds of its conveyances, section 412's words of futurity are applicable not only to the proviso in which those words are contained, but also to the statute's operative clause.

2005. There is no indication that Congress intended to divide section 412's operative provision—both the agency's authority to convey property and its authority to retain the net proceeds in the Federal Buildings Fund—into temporary and permanent parts. To the contrary, the closely connected nature of section 412's authorities to convey property and retain proceeds strongly indicates that both of these authorities were intended to be permanent. Unlike the Property Act, where GSA's disposal function (contained in subchapter III of chapter 5 of title 40 of the United States Code) is separate from its authority to retain proceeds (contained in subchapter IV), section 412 ties those two authorities in the same opening clause: "[GSA] may convey [property by various means] . . . and retain the proceeds of *such dispositions* in an account within the Federal Buildings Fund." 118 Stat. at 3259 (emphasis added). Accordingly, that GSA's authority to retain proceeds is permanent strongly suggests that the authority to convey property is likewise permanent.

Finally, we note that, although the views of the Comptroller General are not legally binding on the Executive Branch, *see Submission of Aviation Insurance Program Claims to Binding Arbitration*, 20 Op. O.L.C. 341, 343 n.3 (1996), the Government Accountability Office has also concluded that section 412 is permanent legislation. *See* Government Accountability Office, GAO-07-349, *Federal Real Property: Progress Made Toward Addressing Problems, but Underlying Obstacles Continue to Hamper Reform* at 19 n.24 (2007).

### III.

For these reasons, we conclude that GSA has the authority to invoke the discretion afforded by section 412 in order to convey SSA property acquired with money derived from the Social Security Trust Funds and to retain any net proceeds in the Federal Buildings Fund.

DANIEL L. KOFFSKY
*Deputy Assistant Attorney General*
*Office of Legal Counsel*